1  Brandon H. Brown, P.C. (SBN 266347)
   bhbrown@kirkland.com
2  KIRKLAND & ELLIS LLP
   555 California Street, 27th Floor
3  San Francisco, CA 94104
   Telephone: (415) 439-1400
4  Facsimile: (415) 439-1500

5  Russell E. Levine, P.C. (*pro hac vice* to be filed)
   russell.levine@kirkland.com
6  Kourtney Baltzer (*pro hac vice* to be filed)
   kourtney.baltzer@kirkland.com
7  KIRKLAND & ELLIS LLP
   300 North LaSalle
8  Chicago, IL 60654
   Telephone: (312) 862-2000
9  Facsimile: (312) 862-2200

10 Steven Dirks (*pro hac vice* to be filed)
   steven.dirks@kirkland.com
11 KIRKLAND & ELLIS LLP
   1301 Pennsylvania Avenue, N.W.
12 Washington, D.C. 20004
   Telephone: (202) 879-5000
13 Facsimile: (202) 879-5200

14 *Attorneys for Plaintiff Valeo Schalter und*
   *Sensoren GmbH*
15 *Additional attorneys listed in signature block*

16

17                    **UNITED STATES DISTRICT COURT**

18                    **NORTHERN DISTRICT OF CALIFORNIA**

19

20 Valeo Schalter und Sensoren GmbH,      )    CASE NO. 23-cv-5721
                                          )
21          Plaintiff,                    )    **COMPLAINT FOR**
                                          )    **MISAPPROPRIATION OF TRADE**
22      v.                                )    **SECRETS**
                                          )
23 Nvidia Corporation,                    )
                                          )    **DEMAND FOR JURY TRIAL**
24          Defendant.                    )
   _____)

25

26

27

28

COMPLAINT                                          CASE NO. 23-cv-5721

Plaintiff Valeo Schalter und Sensoren GmbH ("Valeo") for its Complaint against Nvidia Corporation ("Nvidia" or "Defendant") alleges as follows and hereby demands a jury trial:

### INTRODUCTION

1.     For three decades, Valeo has helped usher in a new era of automotive technology through innovation in advanced driving assistance systems. Today, the actions of one brazen former employee and the company he left Valeo to join—Nvidia—have undermined, and threaten to further undermine, the many years of Valeo's hard work and innovation.  By using Valeo's stolen trade secrets (the former employee has been criminally convicted and a penalty order has issued for his theft), Nvidia has saved millions, perhaps hundreds of millions, of dollars in development costs, and generated profits that it did not properly earn and to which it was not entitled.  In using these stolen trade secrets to develop a competing product, Nvidia has diminished the value of Valeo's trade secrets to Valeo.

2.     In 1923, Valeo's parent company was founded with one goal: serving the automotive industry. In 2023, Valeo proudly celebrates 100 years of innovating and constantly striving to make mobility simpler, safer, and more sustainable.  During these 100 years, Valeo has built and maintained a reputation as a market leader, innovating at every step.

3.     In the 1990s, for example, Valeo was one of the first companies to begin developing ultrasonic parking assistance systems, a novel solution to an age-old problem. In 1991, Valeo developed the now famous reverse beeper parking assistance system, which signals the presence of an obstacle to a driver when reversing by emitting an increasingly loud alert as the driver approaches it.

4.     Valeo won a 2020 PACE Award (Premier Automotive Suppliers' Contribution to Excellence; awarded by Automotive News magazine; one of the most prestigious awards in the industry) for the Valeo XtraVue(TM) Trailer, the world's first system enabling drivers to "see through" the trailer or caravan they are towing.

1
2
3
4
5
6
7
8

 

9 This unique and innovative driving-assistance technology makes towing objects simpler and safer for

10 drivers.  It allows drivers to visualize the environment behind a towed vehicle.  Unveiled as a world

11 first during the 2019 Consumer Electronics Show, the Valeo XtraVue(TM) Trailer was brought to

12 market at the end of the same year, underscoring Valeo's ability to quickly transition from revealing

13 an innovation to starting production.  Many other systems developed and commercialized by Valeo's

14 Comfort & Driving Assistance business group also have been honored with PACE awards, including

15 a back-over protection system, the Park4U® park-assist system (introduced in 2011, it was the world's

16 first automated parking assistance system), a multi-beam-radar blind-spot-detection system, and the

17 LaneVue lane-departure-warning system.  Valeo's innovative vision systems, using ultrasonic sensors,

18 radars and cameras, in conjunction with Valeo's creation of, and constant improvements to, the most

19 advanced "state of the art" electronic control units ("ECUs") in the industry, set the gold standard for

20 automotive original equipment manufacturers ("OEMs") across the globe.

21      5.     In March 2023, Valeo also won GM's Supplier of the Year award in Advanced Driver

22 Assistance Systems for technology ranging from automatic emergency braking in the event of danger,

23 to monitoring driver alertness, maintaining the vehicle in the correct lane, adapting speed

24 automatically, and adjusting lighting.  And in May 2023, Valeo received the SAFETYBEST Award

25 2023 from AUTOBEST (a European auto jury representing 31 countries), as well as the ICA

26 (Innovation Connectivity Autonomous) Automotive Sensor Hardware Solution of the Year Award—

27 demonstrating Valeo's continued commitment to innovation in the automotive industry.  Valeo—

28 having the ultimate mission of making all mobility cleaner, safer, and smarter—is the world leader in

2

driver assistance, equipping one out of every three new cars in the world with technology that enables the vehicle to make the right decisions.  Valeo's innovations and developments have resulted in one of the most advanced driver assistance platforms on the market. These platforms, and the technologies enabling them, make driving safer, more intuitive, more autonomous, and more connected than ever before.

6.     Valeo's innovation and market leadership in this sophisticated technical field is a result of its commitment to investing in R&D and to teaching and training its employees.  With nearly 5,000 research and development employees working on advanced driving assistance systems in 12 Valeo R&D centers spread across the globe, Valeo has invested billions of dollars in developing its advanced driving assistance systems. Similarly, Valeo is committed to training its engineers to become experts in the field. Through in-depth training on both Valeo's ultrasonic sensor hardware and corresponding proprietary post-processing software, Valeo engineers gain knowledge they did not have before working for Valeo and they become specialists who continue to push the boundaries of advanced driving assistance systems.

7.     Such a substantial investment requires protection.  Valeo relies on its trade secrets, patents, copyrights, and trademarks to guard the intellectual property developed as a result of the ingenuity and industry of its employees.

8.     While Valeo has been a leader of key technology in the automotive industry for a century, Nvidia, on the other hand, is a recent entrant to the automotive industry.  Nvidia was founded in 1993, focusing on the personal computing and gaming industry and the design of a type of hardware called graphics processing units ("GPUs"), to improve graphical imaging for computers.  Over the years, Nvidia focused its efforts on the world of personal computing and gaming with its hardware. As the automotive industry began incorporating more computing power into vehicles, however, Nvidia wanted a piece of the action.  In 2015, decades after Valeo began revolutionizing the advanced driving assistance field, Nvidia introduced its Drive computer platform, a hardware system intended to support advanced automotive technology.

9.     For the next several years, Nvidia continued to provide hardware systems until an opportunity presented itself recently to bid on a contract with a major automotive OEM.   The

3

opportunity was to develop software to help power the most advanced parking and driving assistance technology ever offered by that OEM to its customers. Undeterred by its total lack of experience in developing parking assistance software for the automotive industry, Nvidia bid on and was awarded the contract.  Valeo, which had previously provided that OEM with both the hardware and the software for prior parking and driving assistance systems, was only awarded the contract this time to provide ultrasonic sensors, a hardware component used in advanced parking and driving assistance systems.

10.     At the same time, one of Valeo's software engineers—who helped build, code, and develop Valeo's advanced parking and driving assistance software—realized that his knowledge of, and exposure and access to, Valeo proprietary software, technologies, and development techniques would make him exceedingly valuable to Nvidia.  In early 2021, shortly after the OEM customer announced that Nvidia would provide the software for its parking assistance technology, Mr. Mohammad Moniruzzaman, at the time a Valeo employee, downloaded without authorization the entirety of Valeo's advanced parking and driving assistance systems source code.  Mr. Moniruzzaman did so by granting unauthorized access of Valeo's systems to his own personal email account.  He then stole tens of thousands of files and 6 gigabytes of source code, after which, Mr. Moniruzzaman attempted to cover his tracks by subsequently removing his personal account from authorized access. Mr. Moniruzzaman also took with him scores of Valeo Word documents, PowerPoint presentations, PDF files, and Excel spreadsheets explaining various aspects of the technology to further facilitate his understanding of the stolen code, the operation of Valeo's ultrasonic sensors, and the data obtained and transmitted by those sensors.  Months later, in August 2021, Mr. Moniruzzaman ended his employment at Valeo and took the stolen source code and technical documentation with him to Nvidia, receiving a promotion to a senior position working on the software development for the very *same* project for the OEM.

11.     Though this theft initially went undetected for about six months after Mr. Moniruzzaman started working at Nvidia, Mr. Moniruzzaman's and Nvidia's luck eventually wore out.  Under the terms of the contract with the OEM, engineers from both Valeo and Nvidia were to schedule collaboration meetings virtually so that Nvidia employees could ask Valeo employees questions about Valeo's ultrasonic hardware and data associated with the hardware.  On March 8,

2022, one of these videoconference meetings was scheduled. Mr. Moniruzzaman, now employed by Nvidia, attended the videoconference call—along with four other Nvidia employees, all of whom reside in the United States and at least two of whom reside and work in this district—and shared his computer screen during the call.  When he minimized the PowerPoint presentation he had been sharing, however, he revealed one of Valeo's verbatim source code files open on his computer.  So brazen was Mr. Moniruzzaman's theft, the file path on his screen still read "ValeoDocs."  Valeo participants on the videoconference call immediately recognized the source code and took a screenshot before Mr. Moniruzzaman was alerted of his error.  By then it was too late to cover his tracks. An IT audit confirmed that prior to his departure, Mr. Moniruzzaman downloaded the entirety of Valeo's parking and driving assistance source code files, breaching Valeo IT rules and policy, violating the law, and misappropriating Valeo's trade secrets.

12.    In this lawsuit, Valeo seeks, among other remedies, injunctive relief and recovery of damages for Nvidia's trade secret misappropriation, including Mr. Moniruzzaman's brazen misconduct and the illegitimate advantage he has given Nvidia in its development of advanced parking and driving assistance software.  Nvidia's attempts to take a shortcut to the marketplace by leveraging Valeo's stolen software make costly investments in technology futile and harms innovation.  Indeed, Valeo's software and the proprietary teaching and training documents were found on Mr. Moniruzzaman's Nvidia computer, which were seized by German investigators, in connection with a criminal action in Germany against Mr. Moniruzzaman that resulted in Mr. Moniruzzaman's September 8, 2023 conviction for unlawful acquisition, use, and disclosure of Valeo's trade secrets. When questioned by the German police, Mr. Moniruzzaman admitted to stealing Valeo's software and using that software while employed at Nvidia.  In fact, Mr. Moniruzzaman did not deny the charge of the crime at any point during the German criminal investigation.  When German police raided Mr. Moniruzzaman's home as part of the German criminal investigation, they discovered Valeo documentation and hardware pinned on the walls of Mr. Moniruzzaman's home office—showing that Valeo information was a constant reference tool for him while working at Nvidia.  German police also

documented Mr. Moniruzzaman's possession of the Valeo source code and scores of Valeo documents well after his departure from Valeo, and while employed at Nvidia, as shown in the pictures below:





COMPLAINT                                                                    CASE NO. 23-cv-5721

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16   Further, Nvidia has admitted that Valeo's trade secreted code has been used by Nvidia to confirm how

17   to interface Nvidia's software with Valeo's ultrasonic hardware (i.e., by using Valeo's proprietary

18   low-level processing) and Mr. Moniruzzaman admitted that he used the trade secreted code multiple

19   times while at Nvidia.  Discovery likely will show that Nvidia's use of Valeo's trade secrets goes far

20   beyond these already admitted uses.  Unless Nvidia's use and misappropriation is stopped, Nvidia's

21   unlawful actions will be the blueprint for future corporate espionage.

22                                        **THE PARTIES**

23        13.     Plaintiff Valeo Schalter und Sensoren GmbH is a leading global automotive supplier

24   and technology company. Valeo and its affiliate companies have locations throughout the world.

25   Focusing on innovation and development of advanced automotive technology, Valeo's sales in 2022

26   were over $21 billion.  Valeo Schalter und Sensoren GmbH is a company organized and existing under

27   the laws of Germany with its principal place of business at Laiernstraße 12, 74321 Bietigheim-

28

7

Bissingen, Germany.  Valeo supplies its technology, including its driving and parking assistance technology, to motor vehicle manufacturers across the world, including in the United States.

14.     On information and belief, Defendant Nvidia Corporation is a company organized and existing under the laws of Delaware, with its principal place of business at 2788 San Tomas Expressway, Santa Clara, CA 95051.  On information and belief, Nvidia's automated driving arm operates within the United States and employees that develop technology for Nvidia's parking and driving assistance systems reside and work in the United States, including within this district.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§1331 and 1367, and 18 U.S.C. §§1836(c) and 1837.  This Court has supplemental jurisdiction over the state law claim asserted herein because it is related to, arises from a common nucleus of operative fact as, and is part of the same case and controversy as, Valeo's federal claim.

16.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b), because Nvidia is headquartered in this District, transacts business in this District, has misappropriated trade secrets in this District, and is subject to personal jurisdiction in this District.   Further, Nvidia employees involved in the misappropriation of Valeo's trade secrets reside and/or work in this District.

17.     This Court has personal jurisdiction over Nvidia because it is headquartered in Santa Clara, California and is thus "fairly at home" in this District.  Moreover, on information and belief, Nvidia continues to misappropriate Valeo's trade secrets in this District, for example by using Valeo's trade secreted technology in this District.

## DIVISIONAL ASSIGNMENT

18.     This case is an Intellectual Property Action under Civil Local Rule 3-2(c).  Pursuant to Civil Local Rule 3-5(b), this case shall be assigned on a district-wide basis.

## FACTUAL BACKGROUND

### Valeo is a Leader in Technology for Autonomous Vehicles

19.     For nearly three decades, Valeo has been a market leader in the development of hardware and software for autonomous vehicles and driving assistance technology including sensing, parking assistance, and maneuvering.  Valeo's position is not mere happenstance; it is the result of

8

Valeo's investment of more than 30 years and billions of dollars into software for driving assistance systems. Valeo's team of software engineers has worked continuously to develop its technology, and as a direct result of that effort, has developed one of the most advanced automotive object recognition and autonomous vehicle control platforms in the industry.

20. Innovation is the heart of Valeo's development strategy, and the market has, in turn, rewarded it for its innovations. In 2022, Valeo and its affiliates generated over $21 billion in worldwide sales, and Valeo projects double digit increases built on the back of its technological expertise in autonomous driving technology.

21. Valeo and its affiliates employ over 100,000 people worldwide, including in the United States. Valeo's dedication to innovation, and its protection of that innovation, has allowed it to continuously improve the technology powering the ever-growing autonomous vehicle market, including advanced sensors, control units, and algorithms for recognizing objects and assisting drivers. Further, Valeo's commitment to training and teaching has allowed Valeo to cultivate a workforce full of talented engineers. In fact, over 40% of Valeo's engineers are software and system engineers that have helped build Valeo's sought after advanced parking and driving assistance systems, resulting in ever growing worldwide demand for such systems, especially advanced parking assistance systems. In the United States, Valeo affiliates employ approximately 5,000 people at 11 production sites and 3 development centers. Valeo also supplies its technology to all of the major automotive OEMs in the United States.

22. Valeo develops both proprietary hardware (e.g., cameras and sensors) as well as the software that processes the data gathered by the hardware. The physical ultrasonic sensors provide a signal that is referred to as sensor raw data. Software—referred to as ultrasonic low-level processing—is required to process, interpret, and analyze the raw data into functional data referred to as low level sensor data. Finally, the processed data is further analyzed, either by a human or, in the case of autonomous vehicles, by additional software, to provide recommendations or aids based on the interpreted and analyzed data. This is commonly referred to as upper-level data. Valeo is a leading provider of technology that collects and processes all three levels of data, along with the hardware that power advanced driving assistance systems technologies.

9

23. Valeo's hardware and software for parking aids, driving assistance systems, object recognition for autonomous driving, and the visualization of the environment in the on-board systems are used by every major automotive group across the globe, including in the United States, and is the gold standard in the industry.

24. Valeo's advanced technology also is used across a variety of sectors, including new electric vehicle startups, shuttles and unmanned delivery vehicles, commercial vehicles, and consumer vehicles.

25. Valeo's technology has provided impressive results for its automotive partners. For example, using Valeo's world-class technology, Mercedes-Benz received the world's first internationally valid system approval for conditionally automated driving (SAE level 3) in December 2021. (*See* https://www.valeo.com/en/valeos-lidar-technology-the-key-to-conditionally-automated-driving-part-of-the-mercedes-benz-drive-pilot-sae-level-3-system/). And in February 2023, Valeo and the BMW Group announced their cooperation for the co-development of automated parking technologies, which will focus on joint development of high-end parking user experience for customers on private grounds and parking facilities, including such technologies as automated maneuver assistance and automated valet parking. (*See* https://www.valeo.com/en/bmw-and-valeo-engage-in-a-strategic-cooperation-to-co-develop-next-generation-level-4-automated-parking-experience/). Further, in May 2023, Valeo and Renault announced their continued partnership to develop Renault's next generation Software Defined Vehicles, including by providing parking assistance software in addition to electrical and electronic components. (*See* https://www.valeo.com/en/renault-group-and-valeo-sign-a-partnership-in-software-defined-vehicle-development/).

**Valeo Protects its Intellectual Property**

26. To fulfill its goal of continuously improving the development of advanced parking and driving assistance systems, Valeo, and its affiliate companies, take comprehensive measures to protect Valeo's investment in its intellectual property, including its trade secrets, such as its proprietary source code, for which Valeo takes exhaustive measures, both institutionally and contractually, to ensure those trade secrets remain confidential.

10

27.     All hard drives on Valeo laptops and other sensitive computer systems are encrypted. When an employee starts up his or her computer, the employee must use an appropriate password to start the computer.  Valeo's computers can only be used when a physical access card is inserted into the computer and a password is entered, which provides access to the Windows operating system. Each employee is issued one physical access card and is instructed that only one card per employee can be active.  If an employee loses an access card or if it is stolen, it is deactivated and another access card is issued.  Valeo's computers are programmed to lock automatically if the access card is removed from the computer.

28.     Data access is granted only on a need-to-know basis.  For software and source code, like the source code at issue here, only those employees who work with the source code have access to it. Access is further limited by assigning employees specific roles that determine whether they have "read only" access or the ability to download and modify the code. Access is additionally limited by further password protection. If an employee shifts to a different project or moves to a different role at Valeo, the employee will lose access rights that are not required for the new project or role once their manager reports the shift in responsibilities. In addition, Valeo applies the need-to-connect and need-to-use principles, granting employees access to data or particular projects only when then they need to connect or use them.

29.     When an employee is not on-site at a Valeo office, external access to Valeo's networks is possible only through Pulse Secure, a virtual private network (VPN), on a Valeo authorized computer.  Pulse Secure requires the employee to enter another password—different than the password used to log into Windows. The USB ports of Valeo's computers are also disabled by default to prevent data transfer to USB thumb drives or other external hard drives.  Use of USB devices is only allowed with prior approval.

30.     Each employee at Valeo is provided with two Google Drive file storage locations: (1) a "My Drive" storage space for personal storage of files still within the Valeo system, and (2) a "Shared Drive," which includes all folders organization wide that the employee can access.  Transfers from the "Shared Drive" to external sources is restricted and attempts are blocked by the system, warning the employee that "[o]nly people inside Valeo can access files in this shared drive."

11

1

2



3

4

5

6

7

8

9    31.    Transfers from an employee's My Drive are possible, as sharing is integral to how

10   Valeo's day-to-day business operations are run, however a similar warning is given, requiring users

11   to confirm that they intend to share the file with an external account.

12

13



14

15

16

17

18

19

20   32.    Before allowing a user to share a document with an external account, the system also

21   provides the user with a warning that Valeo owns the information and cautions the user about sharing

22   information externally.

23

24

25

26

27

28



33.     Valeo's employment agreements are clear that maintaining confidentiality is paramount.  For example, Section 9 of the employment agreement states:

**§ 9 Confidentiality obligation**

All business matters, in particular company equipment, products, designs and correspondence must be kept confidential from persons for whom this information is not intended, even after termination of the employment relationship.

The disclosure of Company documents, in whole or in part, in original, transcript or copy, is prohibited.

34.     Moreover, Valeo's employment agreement makes clear that Valeo maintains the rights to an employee's work, stating:

**§ 10 Rights to work results, inventions**

The employer is entitled to all work results. This applies regardless of whether they were produced by you alone or together with other employees. The same applies to results which, although not attributable to a direct work order, are related to your area of activity.

You undertake to grant the employer the exclusive right of use with regard to all types of use without any restriction in terms of space, time or content, in the event that you acquire copyrights or other non-transferable property rights to work results. This includes the authority of the employer to transfer rights of use in whole or in part to others or to grant other rights of use without separate consent for each individual case. Claims for the transfer of these rights to the employer are compensated with the remuneration.

Any invention made during the term of the employment relationship - even of a non-official nature - must be reported to the employer immediately and in writing. In all other respects, the applicable statutory provisions on employee inventions shall apply.

35.     Mr. Moniruzzaman signed an employment agreement with these provisions before beginning his employment at Valeo.

36.     Valeo's IT Charter also makes equally clear the importance of confidentiality and protection of Valeo's intellectual property, stating:

13

**3.1 Principle: Ethical Use**

55. Information technology and electronic communication equipment must be used in compliance with the law, third party rights and, in particular, intellectual property rights, image rights, personal data protection rules and, in general, the Code of Ethics and Valeo policies.

**3.3 Data Protection**

58. In accordance with the Code of Ethics and Valeo's rules and procedures, the user is prohibited from:

...

Disseminate information or photographs relating to Valeo's products, prototypes, sites, plans, partners or customers without first obtaining permission for such dissemination.

59. In case of doubt, the user must contact the Human Resources Department or the Legal Department.

**3.4 Confidentiality**

72. Finally, the user is strictly prohibited from using his personal email account to share documents or professional collaboration spaces such as Google Drive Terms of Service or Google Sites and transmit them to the private space.

37.     Each employee is required to sign a form that acknowledges their understanding of the IT Charter and Mr. Moniruzzaman signed a form acknowledging his understanding of this IT Charter.

38.     Employees undergo routine awareness sessions and trainings regarding IT policies. Employees are also required to review Valeo's cybersecurity policies, which forbid employees from storing Valeo documentation on any non-Valeo device or storage method.

39.     When an employee leaves Valeo, they sign termination agreements acknowledging that they must return all Valeo documents and other Valeo items in their possession.

40.     Mr. Moniruzzaman signed a termination agreement containing such a provision upon terminating his employment at Valeo.

41.     A leaving employee must further sign a checklist before leaving acknowledging that all Valeo documents and equipment have been returned to Valeo and that all Valeo data has been handed over.

42.     Prior to leaving Valeo, Mr. Moniruzzaman signed a checklist confirming that he returned all Valeo documents, equipment, and data in his possession.

14

43.     Valeo's source code files in particular note that its code is attributable to Valeo and indicate that "[d]istribution or duplication without previous written agreement of the owner prohibited." This appears in the lines that precede Valeo source code files as shown in the image below:



44.     Valeo also takes caution to clearly mark sensitive internal training and teaching documents containing proprietary information with confidentiality designations, as shown in the example below:

ii            Valeo Schalter und Sensoren GmbH Confidential

45.     As is common for suppliers in the automotive industry, Valeo also protects itself contractually through non-disclosure agreements with third parties.

**Nvidia Is a New Supplier of Technology for Autonomous Vehicles**

46.     Nvidia develops graphics processors and chipsets for personal computers, servers, and video gaming consoles.  Incorporated in Delaware and headquartered in Santa Clara, California, Nvidia is known for developing computing hardware, specifically graphics processing units (GPUs), specialized computer components used to power computer graphics and image processing.

47.     In 2015, Nvidia announced its Nvidia Drive computer platform.  In the years following the launch of the Nvidia Drive system, Nvidia's efforts focused on further improving its hardware capabilities for autonomous vehicle solutions.

48.     On information and belief, Nvidia has not previously developed parking assistance software.

**Valeo and a Major Automotive OEM Have a Long-Established Relationship**

49.     For several years, Valeo has been providing autonomous vehicle technology systems, to a major automotive OEM.  From the outset of this relationship, Valeo provided this OEM with ***both*** the hardware and software components for these systems.  In particular, Valeo provided the OEM with ultrasonic sensors generating sensor raw data, along with the software for processing that data to generate low-level sensor data as well as upper-level data across multiple projects.

50.     Recently, for a new parking assistance project, the OEM received Request for Quotation (RFQ) responses from Valeo and other suppliers.  For the first time, the OEM selected Valeo to provide ultrasonic hardware generating sensor raw data only.  For its lower and upper-level software, the OEM selected Nvidia.  On information and belief, this was the first time the OEM entered into an agreement with Nvidia for advanced parking and driving assistance systems.  This was, on information and belief, the first time Nvidia entered into an agreement to provide lower or upper-level software to interpret and process ultrasonic sensor raw data. On information and belief, Nvidia submitted its RFQ response to the OEM without having the necessary personnel or technical know-how to develop such software.

51.     Under a cooperation agreement with the OEM, Nvidia software developers were given the opportunity for one year to ask Valeo's developers certain questions to facilitate Nvidia's development work.  These questions were answered through Question & Answer documents and video conferences between Valeo and Nvidia employees between late 2020 to early 2022.  Prior to answering Nvidia's questions, Valeo ensured that none of Valeo's intellectual property was disclosed or contained in its answers.

**During Video Call with Nvidia, Valeo Learned Its Trade Secrets Were Being Used by Nvidia**

52.     On or around March 8, 2022, Valeo met with Nvidia as part of the cooperation agreement.  The meeting was conducted virtually, using Microsoft's Teams software, which allows screensharing.  The subject of the meeting was "Ultrasonic Low Level Processing" and the participants included the following individuals:

| Valeo Employees | Nvidia Employees |
|---|---|
| Karlheinz Stadler | Mohammad Moniruzzaman (Senior Perception Engineer) |
| Mihai Batrinu | Arthur Rajala (Senior System Software Engineer) |
| Uwe Mischke | Neil Patel (Senior Systems Software Engineer) |
| Dieter Henz | Rajkumar Jayaraman (Senior Engineering Manager, System Software) |
| | Waikit Sin (Senior Manager in Technical Marketing & Product Management) |

53.     One of the Nvidia participants on the call, Mr. Moniruzzaman, was previously employed as a Product Software Developer at Valeo since 2015, participating in the development of the software for Valeo's parking and driving assistance systems. On or about August 31, 2021, months after the OEM announced that Nvidia would be the software developer for the project, Mr. Moniruzzaman left Valeo and immediately began working at Nvidia in a more senior role, as a Senior Perception Engineer.  All of the other Nvidia employees on the call also were senior engineers or managers at Nvidia.

54.     Other than Mr. Moniruzzaman, the Nvidia employees on the call reside and work in the United States and at least two of the four reside and work in this judicial district.  Indeed, the LinkedIn profiles of both Rajkumar Jayaraman and Waikit Sin indicate that they live and work in the San Francisco Bay area.

55.     During the March 8, 2022 video conference, Mr. Moniruzzaman began sharing the screen of, on information and belief, his Nvidia-issued computer.  Initially, Mr. Moniruzzaman showed a presentation containing questions for the Valeo participants.  After the presentation ended, however, Mr. Moniruzzaman minimized the presentation but did not end the screen sharing function.  As a result, a source code program window became visible on the shared screen, which the Valeo and other Nvidia participants were able to view.

56.     Due in part to their combined years of experience developing Valeo's software, the Valeo participants immediately recognized the source code as Valeo's proprietary software. Mr. Dieter Henz, a Valeo employee, took a screenshot of the source code program that was being shared.

57.     Mr. Moniruzzaman was subsequently alerted by another participant on the call that he was still sharing his screen and then stopped his screen share of Valeo's code.

17

58.     After the video conference concluded, Mr. Henz reviewed the screenshot he captured of Mr. Moniruzzaman's source code program.  Mr. Henz recognized that Mr. Moniruzzaman had searched for certain keywords within the source code, presumably during the meeting.  Those keywords were highlighted in red in the source code program.  The search showed that Mr. Moniruzzaman searched for a specific proprietary Valeo variable during the course of the meeting, suggesting that Mr. Moniruzzaman was regularly using the Valeo code in his work for Nvidia, and he was still very familiar with it even though he had been working at Nvidia for months.

59.     Moreover, the file path of the source code files Mr. Moniruzzaman accessed was: "Desktop/works/personal/**ValeoDocs**/code/gitRepoSmall," and also included the folder structure used by Valeo: "dassys/uspm/ulfx03," confirming that these files were Valeo source code files.

60.     Furthermore, the source code file names visible in the screenshare were identical to the file names used in Valeo's source code.

61.     Upon inspection of the code itself, Mr. Henz further confirmed that the source code itself appeared to be identical to the proprietary source code maintained in Valeo's source code repositories.

**Valeo's Internal Technology Audit and the German Criminal Proceedings Confirm Valeo's Trade Secrets Were Intentionally Stolen**

62.     After the Valeo participants on the March 8, 2022 video conference with Nvidia identified Valeo's source code, Valeo conducted a comprehensive internal forensic IT audit to determine whether Mr. Moniruzzaman had retrieved the source code files without authorization prior to his departure from Valeo to Nvidia.

63.     The results of this audit revealed that on April 13, 2021, while still employed at Valeo, Mr. Moniruzzaman copied four repositories (i.e., digital data warehouses used to store source code), comprising the entirety of Valeo's parking and driving assistance source code, from his Valeo computer to a personal computer by sharing a download link of the files with his personal email address.

64.     Mr. Moniruzzaman himself confirmed that the email address used is his own personal email.  When Mr. Moniruzzaman left Valeo, he sent a farewell email to his colleagues, stating that he could be reached via this same personal email address.

65.     The four repositories, containing over 27,000 files[1] and totaling over 6Gb worth of source code files, were combined into a zip-folder titled "gitRepo.7z." This folder contains the same "gitRepo" file path name that was displayed on Mr. Moniruzzaman's screen during the March 8, 2022 videoconference.  The zip-folder, which was downloaded by Mr. Moniruzzaman, comprised source code relating to trade-secreted Valeo functionalities—functionalities that Valeo uniquely implements—including processing of ultrasonic sensor signal data for echo tracking, height classification, and trilateration as well as sensor fusion for the creation of an environmental map, measuring parking spot dimensions, park maneuvering, and emergency braking, amongst other trade-secreted functionalities that are key to Valeo's parking and driving assistance software.

66.     On information and belief, Mr. Moniruzzaman was aware, prior to downloading Valeo's source code without authorization, that the OEM had selected Nvidia to provide the low-level and upper-level software for the upcoming parking and driving assistance project.  For example, the audit showed that in January 2021, Mr. Moniruzzaman accessed an internal PowerPoint presentation describing the OEM's contract and Nvidia's role in providing the low-level and upper-level software.

67.     Because Valeo's IT security prohibits transfer of Valeo documents to an external account through the Shared Drive, Mr. Moniruzzaman first copied the zip-folder into his My Drive folder.  Then, he added his private Google user account to the authorized recipients list on Google and shared a download link to his email address.  Valeo's IT security provides a warning when sending documents from the My Drive location to an external user, even when the external account is on the authorized recipients list. Mr. Moniruzzaman, therefore, would have been required to confirm that he intended to share this zip-folder to his personal account. As confirmed by the IT audit, seventeen

---

[1]   A small number of the files (less than 1%) are publicly-licensed software tools commonly used for development framework and testing, while the rest of the source code has been developed by Valeo.

1    minutes after he downloaded the zip-folder to his personal account, Mr. Moniruzzaman removed his

2    account from the authorized recipients list, presumably in an effort to cover his tracks.

3         68.    The scope of Mr. Moniruzzaman's brazen theft—which Mr. Moniruzzaman admitted

4    to committing in a German criminal proceeding—cannot be understated.  The tens of thousands of

5    source code files, totaling over 6Gb of data, includes files pertaining to Valeo's unique implementation

6    of trade-secreted parking and driving assistance functionalities, including code used in processing

7    ultrasonic sensor signal data for echo tracking, height classification, and trilateration as well as sensor

8    fusion for the creation of an environmental map, measuring parking spot dimensions, park

9    maneuvering, emergency braking, and many others.  That zip-folder contained decades of dedicated

10   work, comprising billions of dollars' worth of research and development that—due to Valeo's

11   confidential protection—has allowed Valeo to become a market leader in parking and driving

12   assistance systems and autonomous vehicle technology for motor vehicle manufacturers.

13        69.    Further, the German criminal proceedings against Mr. Moniruzzaman have revealed

14   that, beyond the source code, Mr. Moniruzzaman also took scores of additional Valeo documents

15   containing Valeo proprietary information, that were used to teach and train him (and others) about,

16   and to facilitate his (and others) understanding of, Valeo's ultrasonic sensors and Valeo's proprietary

17   code for post-processing the data from those sensors. Many of these documents have been designated

18   as strictly confidential and for internal Valeo use only and contain content that has never been shared

19   outside of Valeo. Some also contain Valeo trade secreted material that Valeo developed to teach its

20   employees about Valeo's proprietary signal processing and source code.  By taking these files, Mr.

21   Moniruzzaman ensured that he did not just take Valeo's source code, but materials that would help

22   him use Valeo's source code at Nvidia—none of which he should have had in his possession after

23   leaving Valeo.  Some of these additional documents include the following document titles and

24   descriptions:

25       • **ID.docx:** This document describes requirements of Valeo's software design for code
           relating to ultrasonic feature extraction in Valeo's parking and driving assistance source
26         code and textually describes how to accomplish certain proprietary features found in
           Valeo's code.  By providing a checklist of what is mandatory for feature extraction, this
27         document could facilitate implementation of Valeo's trade secrets into other code. The
           document contains information that Valeo considers to be highly confidential.
28

20

- **OBJD_Design.pdf:** This document is a detailed explanation of Valeo's proprietary sensor fusion processing and includes an in-depth discussion of various algorithms in Valeo's parking and driving assistance source code. The document contains information that Valeo considers to be highly confidential.

- **OBJDTraing.pdf:** This is a training presentation explaining various proprietary algorithms in Valeo's parking and driving assistance source code as well as how signal interpretation in the code occurs. The document contains information that Valeo considers to be highly confidential.

- **OBJD4 No FPU Subsystem Training.pptx:** This is a training presentation explaining various proprietary algorithms in Valeo's parking and driving assistance source code as well as how signal interpretation in the code occurs. The document contains information that Valeo considers to be highly confidential.

- **Training_UltrasonicSignalProcessing.pdf:** This is training material explaining the proprietary architecture and design details of Valeo's ultrasonic sensors and their signal processing. The document contains information that Valeo considers to be highly confidential.

70.     After downloading the stolen source code files and other documentation to his personal laptop, Mr. Moniruzzaman subsequently transferred those files to his Nvidia-issued computer via a USB stick. As part of the German criminal investigation, Mr. Moniruzzaman's Nvidia computers were seized, and law enforcement confirmed the presence of the stolen source code files and also discovered the teaching and training documentation discussed above. On September 8, 2023, Mr. Moniruzzaman was convicted in Germany for unlawful acquisition, use, and disclosure of Valeo's trade secrets.

71.     On information and belief, the trade secrets contained in the source code files and other documentation stolen by Mr. Moniruzzaman have been shared with other Nvidia software engineers who have access to and are using Valeo's trade secrets. Given Mr. Moniruzzaman's use of Valeo's code during the March 8, 2022 videoconference, on information and belief, Mr. Moniruzzaman has shared trade secrets from the code with others at Nvidia, including at least the senior software engineers and managers employed by Nvidia and located in the U.S. who were present on the March 8, 2022 videoconference. On information and belief, Nvidia was aware that Mr. Moniruzzaman had previously worked on Valeo's parking assistance software. Mr. Moniruzzaman downloaded Valeo's trade secreted source code to his personal computer in April 2021, which is, on information and belief, during the time when he was interviewing at Nvidia. Mr. Moniruzzaman first notified Valeo that he would be terminating his employment at Valeo just a month later in May 2021. On information and

COMPLAINT                                                                                    CASE NO. 23-cv-5721

1    belief, Nvidia needed Valeo's trade secrets via Mr. Moniruzzaman to solve problems it was having

2    with its software project for the OEM.

3            72.    Nvidia's misappropriation of Valeo's trade secrets provided Nvidia and its engineers a

4    shortcut in the development of its first parking-assistance software, and saved Nvidia millions, perhaps

5    hundreds of millions, of dollars in development costs.  In using these stolen trade secrets in connection

6    with the research and development of a competing product, Nvidia has diminished the value of Valeo's

7    trade secrets to Valeo.

8            73.    On information and belief, the trade secrets contained in Valeo's stolen source code

9    and other documentation have been used in the development of Nvidia's software for the OEM's

10   parking assistance project, including by Nvidia employees in the United States, as evidenced during

11   the March 8, 2022 videoconference call.  Indeed, Nvidia Corporation—rather than Nvidia's German

12   affiliate—was the entity that hired lawyers in connection with German civil proceedings concerning

13   allegations of copyright infringement of Valeo's code and actively participated in review of documents

14   from that proceeding via English translations.  Further, Nvidia has admitted that Valeo's code has been

15   used by Nvidia to "interface" the data coming from Valeo's ultrasonic hardware with Nvidia's code.

16   (*See* Ex. A, June 7, 2022 Letter from Nvidia to Valeo, at 2.)  Under the cooperation agreement with

17   the OEM, Valeo was to provide information concerning the raw data generated by its sensors while

18   Nvidia was to utilize this data—and its own interfacing algorithms—to extract features from the data

19   that could then be used in higher level processing.  Much of Valeo's proprietary data processing rests

20   in its initial low-level processing or "interfacing" of data generated by its sensors—proprietary data

21   processing that is directed to echo tracking, height classification, echo buffering, and trilateration

22   calculations amongst other proprietary functionalities.  This processing helps "interface" the data

23   generated by Valeo's sensors with Valeo's higher level code directed to sensor fusion for the creation

24   of an environmental map, measuring parking spot dimensions, park maneuvering, and emergency

25   braking, amongst other proprietary functionalities.  By admitting that Valeo's code was used to

26   confirm how to interface Nvidia's code with the data generated by Valeo's sensors, Nvidia has

27   admitted that Valeo's code was misappropriated to ensure Nvidia was able to achieve Valeo's

28   proprietary low-level data processing functionalities.  Further, in the German proceedings, Mr.

                                                  22

Moniruzzaman admitted that he made use of Valeo's trade secreted source code on more than one occasion and that his use during the March 8, 2022 videoconference was merely the most recent time he used the source code.

74.     While Nvidia has suggested to Valeo that it has removed Mr. Moniruzzaman's additions to the code, Nvidia has further asserted that additions Mr. Moniruzzaman made to Nvidia's code underwent a peer review process of 10-30 iterations of feedback loops before the code was fully merged into Nvidia's database, so as to bring the code in line with Nvidia's original design and project vision.  Thus, by merging Mr. Moniruzzaman's additions into the code in a way such that the additions underwent extensive edits by others, it is not realistic that Nvidia could fully remove Mr. Moniruzzaman's additions to the code nor remove all ideas, frameworks, or solutions Mr. Moniruzzaman otherwise suggested be made to the code—either by making direct additions himself or by making suggestions to other Nvidia employees.

75.     Mr. Moniruzzaman's acquisition and use of Valeo's stolen software and teaching and training documentation as well as the trade secrets contained therein have been, and will continue to prove to be, invaluable to Nvidia's development of the software for use in the OEM's contract and in other future projects.  In addition, the stolen trade secrets also may provide Nvidia the ability to compete, unlawfully, with Valeo in response to other RFQs from the OEM and other OEMs on parking and driving assistance software and other autonomous vehicle software. By leveraging Valeo's dedication to innovation and engineering, the potential for Nvidia's ill-gotten gains is staggering.

**FIRST CAUSE OF ACTION**

**Violation of Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1837**

76.     Plaintiff Valeo incorporates all of the above paragraphs 1–75 as though fully set forth herein.

77.     Valeo is the owner of certain valuable trade secrets described herein and contained in source code relating to advanced parking and driver assistance systems as described in ¶¶ 65, 68-69, and 73 above. These trade secrets are related to Valeo's products, systems, and services that are used in or intended for use in interstate and foreign commerce and that are sold across state and country

COMPLAINT                                                                                           CASE NO. 23-cv-5721

borders.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Valeo.

78.     Mr. Moniruzzaman was hired by Valeo on September 1, 2015 and in the course of his employment signed agreements that prohibited him from disclosing Valeo's confidential trade secrets to others.  Mr. Moniruzzaman gained access to Valeo's trade secrets in the course of his employment with Valeo.  He improperly acquired and retained Valeo's trade secrets upon termination of his employment in 2021 as described in ¶¶ 10-12 and 55-75.

79.     Mr. Moniruzzaman subsequently used and disclosed Valeo's trade secrets to Nvidia. Accordingly, Nvidia and its employees, including those in this District, are in possession of the foregoing Valeo trade secrets, which Mr. Moniuzzaman was expressly prohibited from disclosing according to his employment agreement with Valeo.

80.     Nvidia improperly acquired Valeo's trade secrets from Mr. Moniruzzaman and, on information and belief, has since improperly used those Valeo trade secrets, including by incorporating them into the parking and driving assistance system software Nvidia is designing for the OEM and by using the trade secrets to interface Nvidia's software with Valeo's ultrasonic sensor hardware to achieve Valeo's proprietary functionalities, exploiting Valeo's trade secreted source code for its own advantage.

81.     On information and belief, Nvidia's improper use of Valeo's trade secrets has occurred in the United States and California, including at least by the four other Nvidia employees who were on the March 8, 2022 videoconference call as well as at least three other Nvidia employees that have worked with Mr. Moniruzzaman on software development, at least five of which reside and/or work in California.  This includes Mr. Moniruzzaman's direct superior, the Director of Software Engineering at Nvidia, who is located in the U.S. and is employed by Nvidia.  In fact, Mr. Moniruzzaman contacted this Director in the U.S. when German police raided Mr. Moniruzzaman's residence in connection with the German criminal action.  Nvidia was directly overseeing and collaborating with Mr. Moniruzzaman in connection with his work on Nvidia's software development. Further, Nvidia—rather than Nvidia's German affiliate—hired lawyers in connection with German

24

civil proceedings concerning allegations of copyright infringement of Valeo's code and actively participated in review of documents from that proceeding via English translations.

82.     On information and belief, Nvidia's improper use of Valeo's trade secrets also has occurred in the United States and California in connection with Mr. Moniruzzaman's work done via remote access to at least one computer located in an Nvidia Santa Clara, California office, which Nvidia has admitted that Mr. Moniruzzaman had access to in the German proceedings.

83.     Further, on information and belief, Nvidia's improper use of Valeo's trade secrets also has occurred in the United States and California as a result of Nvidia's operation and utilization of its code in the United States and California as well as its marketing and sale of its software containing Valeo's trade secrets to at least the major automotive OEM discussed in ¶¶ 9 and 50-51 above.

84.     On information and belief, Nvidia is able to bring its software to market according to the major automotive OEM's project timeline—and earlier than it otherwise would have been able to—because of the misappropriation of Valeo's trade secrets, such as through utilizing Valeo's code to confirm how to interface Nvidia's software with Valeo's sensors.

85.     On information and belief, Nvidia saved millions of dollars in development costs because of the misappropriation of Valeo's trade secrets.  In using these stolen trade secrets to develop a competing product, Nvidia has diminished the value of Valeo's trade secrets to Valeo.

86.     Nvidia knew or had reason to know that Valeo's trade secrets were acquired through improper means, including through the fact that Mr. Moniruzzaman knew that he improperly acquired the source code and teaching and training documentation at the time these materials were used by Mr. Moniruzzaman while at Nvidia and at Nvidia's benefit.  Further, Nvidia knew or had reason to know that Valeo's trade secrets were acquired through improper means as a result of its senior engineers and senior managers, and Nvidia's Director of Software Engineering, being aware that Valeo's code was acquired through improper means, at least as a result of Mr. Moniruzzaman screensharing Valeo's code—labeled as "ValeoDocs"—during the March 8, 2022 videoconference.  Mr. Moniruzzaman's contributions to Nvidia's code, either by directly making additions to the code himself or by making suggestions and contributing ideas to other Nvidia employees, should have alerted these other Nvidia employees that Valeo's trade secrets were acquired through improper means.  Mr. Moniruzzaman's

25

open sharing of Valeo's trade secrets—like in the March 8, 2022 videoconference described above—is unlikely to be an isolated incident.

87.     On information and belief, Nvidia was aware that Mr. Moniruzzaman had previously worked on the implementation and interfacing of Valeo's software with its ultrasonic sensors.  Mr. Moniruzzaman downloaded Valeo's trade secreted source code to his personal computer in April 2021, which is, on information and belief, during the time when he was interviewing at Nvidia.  Mr. Moniruzzaman first notified Valeo that he would be terminating his employment at Valeo just a month later in May 2021.  Mr. Moniruzzaman then began working at Nvidia—receiving a promotion to a more senior position—in September 2021, shortly after his employment at Valeo concluded on August 31, 2021.  On information and belief, Nvidia needed Valeo's trade secrets via Mr. Moniruzzaman to be able to complete its software project for the OEM.

88.     As a result of civil and criminal proceedings in Germany, Nvidia also has become aware that Valeo's trade secrets were acquired through improper means.  Any subsequent use of Valeo's trade secrets by Nvidia—including operation and utilization of Nvidia's code as well as its marketing and sale, across state and country borders, of software incorporating Valeo's trade secrets, in addition to bringing its parking assistance system software to market earlier than it otherwise would have—has been done with this knowledge. Indeed, Nvidia has admitted that Mr. Moniruzzaman's code was merged into Nvidia's database after undergoing extensive edits and feedback loops by other employees so as to bring the code in line with Nvidia's original design and project vision, making it unrealistic for Nvidia to remove the ideas, frameworks, or solutions that Mr. Moniruzzaman added to the code.

89.     Nvidia willfully and maliciously misappropriated Valeo's trade secrets in order to gain economic value from those trade secrets.

90.     Valeo has taken reasonable measures to maintain the secrecy of its trade secrets, including through the measures stated in ¶¶ 26-45 above.

91.     Valeo's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Valeo's trade secreted source code for

26

1    parking and driving assistance software is the culmination of decades of work and billions of dollars'

2    worth of research and development that—as a result of Valeo's confidential protection—has allowed

3    Valeo to become a market leader in parking and driving assistance systems and autonomous vehicle

4    technology for OEMs worldwide.

5         92.    On information and belief, if Nvidia is not enjoined, it will continue to misappropriate

6    and use Valeo's trade secret information for its own benefit and to Valeo's detriment, and it may

7    disseminate those trade secrets to third parties.

8         93.    As the direct and proximate result of Nvidia's conduct, Valeo has suffered and, if

9    Nvidia's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury,

10   and significant damages, in an amount to be proven at trial.

11        94.    As the direct and proximate result of Nvidia's conduct, Nvidia has made and, if

12   Nvidia's conduct is not enjoined, will continue to make, higher profits than it otherwise would have

13   made, the amount of such profits to be proven at trial.

14        95.    Because Valeo's remedy at law is inadequate, Valeo seeks, in addition to damages,

15   injunctive relief to recover and protect its trade secrets and to protect other legitimate business

16   interests.  Valeo's business operates in a competitive market and will continue suffering irreparable

17   harm absent injunctive relief.

18        96.    Valeo has no adequate remedy at law.

19                              **SECOND CAUSE OF ACTION**

20        **Violation of California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq.***

21        97.    Plaintiff Valeo incorporates all of the above paragraphs 1-96 as though fully set forth

22   herein.

23        98.    Valeo is the owner of certain valuable trade secrets described herein and contained in

24   source code relating to advanced parking and driver assistance systems as described in ¶¶ 65, 68-69,

25   and 73 above.  These trade secrets are related to Valeo's products, systems, and services.  These

26   confidential and proprietary trade secrets are of substantial economic value and have conferred a

27   competitive advantage on Valeo.

28

                                        27

99.     Mr. Moniruzzaman was hired by Valeo on September 1, 2015 and in the course of his employment signed agreements that prohibited him from disclosing Valeo's confidential trade secrets to others.  Mr. Moniruzzaman gained access to Valeo's trade secrets in the course of his employment with Valeo.  He improperly acquired and retained Valeo's trade secrets upon termination of his employment in 2021 as described in ¶¶ 10-12 and 55-75.

100.    Mr. Moniruzzaman subsequently used and disclosed Valeo's trade secrets to Nvidia. Accordingly, Nvidia and its employees, including those in this District, are in possession of the foregoing Valeo trade secrets, which Mr. Moniuzzaman was expressly prohibited from disclosing according to his employment agreement with Valeo.

101.    Nvidia improperly acquired Valeo's trade secrets from Mr. Moniruzzaman and, on information and belief, has since improperly used those Valeo trade secrets, including by incorporating them into the parking and driving assistance system software Nvidia is designing for the OEM and by using the trade secrets to interface Nvidia's software with Valeo's ultrasonic sensor hardware to achieve Valeo's proprietary functionalities, exploiting Valeo's trade secreted source code for its own advantage.

102.    On information and belief, Nvidia's improper use of Valeo's trade secrets has occurred in the United States and California, including at least by the four other Nvidia employees who were on the March 8, 2022 videoconference call as well as at least three other Nvidia employees that have worked with Mr. Moniruzzaman on software development, at least five of which reside and/or work in California.  This includes Mr. Moniruzzaman's direct superior, the Director of Software Engineering at Nvidia, who is located in the U.S. and is employed by Nvidia.  In fact, Mr. Moniruzzaman contacted this Director in the U.S. when German police raided Mr. Moniruzzaman's residence in connection with the German criminal action.  Nvidia was directly overseeing and collaborating with Mr. Moniruzzaman in connection with his work on Nvidia's software development. Further, Nvidia—rather than Nvidia's German affiliate—hired lawyers in connection with German civil proceedings concerning allegations of copyright infringement of Valeo's code and actively participated in review of documents from that proceeding via English translations.

103.    On information and belief, Nvidia's improper use of Valeo's trade secrets also has occurred in the United States and California in connection with Mr. Moniruzzaman's work done via remote access to at least one computer located in an Nvidia Santa Clara, California office, which Nvidia has admitted Mr. Moniruzzaman had access to in the German proceedings.

104.    Further, on information and belief, Nvidia's improper use of Valeo's trade secrets also has occurred in the United States and California as a result of Nvidia's operation and utilization of its code in the United States and California as well as its marketing and sale of its software containing Valeo's trade secrets to at least the major automotive OEM discussed in ¶¶ 9 and 50-51 above.

105.    On information and belief, Nvidia is able to bring its software to market according to the major automotive OEM's project timeline—and earlier than it otherwise would have been able to—because of the misappropriation of Valeo's trade secrets, such as through utilizing Valeo's code to confirm how to interface Nvidia's software with Valeo's sensors.

106.    On information and belief, Nvidia saved millions of dollars in development costs because of the misappropriation of Valeo's trade secrets.  In using these stolen trade secrets to develop a competing product, Nvidia has diminished the value of Valeo's trade secrets to Valeo.

107.    Nvidia knew or had reason to know that Valeo's trade secrets were acquired through improper means, including through the fact that Mr. Moniruzzaman knew that he improperly acquired the source code and teaching and training documentation at the time these materials were used by Mr. Moniruzzaman while at Nvidia and at Nvidia's benefit.  Further, Nvidia knew or had reason to know that Valeo's trade secrets were acquired through improper means as a result of its senior engineers and senior managers, and Nvidia's Director of Software Engineering, being aware that Valeo's code was acquired through improper means, at least as a result of Mr. Moniruzzaman screensharing Valeo's code—labeled as "ValeoDocs"—during the March 8, 2022 videoconference.  Mr. Moniruzzaman's contributions to Nvidia's code, either by directly making additions to the code himself or by making suggestions and contributing ideas to other Nvidia employees, should have alerted these other Nvidia employees that Valeo's trade secrets were acquired through improper means.  Mr. Moniruzzaman's open sharing of Valeo's trade secrets—like in the March 8, 2022 videoconference described above—is unlikely to be an isolated incident.

29

108.    On information and belief, Nvidia was aware that Mr. Moniruzzaman had previously worked on the implementation and interfacing of Valeo's software with its ultrasonic sensors.  Mr. Moniruzzaman downloaded Valeo's trade secreted source code to his personal computer in April 2021, which is, on information and belief, during the time when he was interviewing at Nvidia.  Mr. Moniruzzaman first notified Valeo that he would be terminating his employment at Valeo just a month later in May 2021.  Mr. Moniruzzaman then began working at Nvidia—receiving a promotion to a more senior position—in September 2021, shortly after his employment at Valeo concluded on August 31, 2021.  On information and belief, Nvidia needed Valeo's trade secrets via Mr. Moniruzzaman to be able to complete its software project for the OEM.

109.    As a result of civil and criminal proceedings in Germany, Nvidia also has become aware that Valeo's trade secrets were acquired through improper means.  Any subsequent use of Valeo's trade secrets by Nvidia—including operation and utilization of Nvidia's code as well as its marketing and sale of software incorporating Valeo's trade secrets, in addition to bringing its parking assistance system software to market earlier than it otherwise would have—has been done with this knowledge.  Indeed, Nvidia has admitted that Mr. Moniruzzaman's code was merged into Nvidia's database after undergoing extensive edits and feedback loops by other employees so as to bring the code in line with Nvidia's original design and project vision, making it unrealistic for Nvidia to remove the ideas, frameworks, or solutions that Mr. Moniruzzaman added to the code.

110.    Nvidia willfully and maliciously misappropriated Valeo's trade secrets in order to gain economic value from those trade secrets.

111.    Valeo has taken reasonable measures to maintain the secrecy of its trade secrets, including through the measures stated in ¶¶ 26-45 above.

112.    Valeo's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Valeo's trade secreted source code for parking and driving assistance software is the culmination of decades of work and billions of dollars' worth of research and development that—as a result of Valeo's confidential protection—has allowed

Valeo to become a market leader in parking and driving assistance systems and autonomous vehicle technology for OEMs worldwide.

113.    On information and belief, if Nvidia is not enjoined, it will continue to misappropriate and use Valeo's trade secret information for its own benefit and to Valeo's detriment, and it may disseminate those trade secrets to third parties.

114.    As the direct and proximate result of Nvidia's conduct, Valeo has suffered and, if Nvidia's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

115.    As the direct and proximate result of Nvidia's conduct, Nvidia has made and, if Nvidia's conduct is not enjoined, will continue to make, higher profits than it otherwise would have made, the amount of such profits to be proven at trial.

116.    Because Valeo's remedy at law is inadequate, Valeo seeks, in addition to damages, injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests.  Valeo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

117.    Valeo has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Valeo prays for relief as follows:

118.    Award judgment in favor of Valeo and against Nvidia on all of Valeo's claims asserted in its Complaint;

119.    Award a preliminary and/or permanent injunction prohibiting Nvidia and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them from using or disclosing Valeo's trade secrets.

120.    Award a preliminary and/or permanent injunction restraining and enjoining Nvidia from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper electronic documents, including current or archived electronic logs, metadata, and directories.

121.    Declare that Nvidia has no rights or privileges to use Valeo's trade secrets.

122.    Award Valeo restitution in an amount to be determined at trial.

123.    Award Valeo damages in an amount to be determined at trial.

124.    Award Valeo punitive damages in an amount to be determined at trial.

125.    Award Valeo a disgorgement of Nvidia's profits.

126.    Award Valeo Nvidia's saved development costs.

127.    Award Valeo pre-judgment and post-judgment interest.

128.    Award Valeo attorneys' fees and costs.

129.    Award Valeo such other relief as the Court deems appropriate.

## JURY DEMAND

130.    Pursuant to Federal Rule of Civil Procedure 38(b), Valeo hereby demands trial by jury of all issues properly triable thereby.

COMPLAINT

CASE NO. 23-cv-5721

1

2      DATED:  November 7, 2023                    Respectfully submitted,

3                                                  KIRKLAND & ELLIS LLP

4
                                                   */s/Brandon H. Brown*
5                                                  Brandon H. Brown, P.C. (SBN 266347)
                                                   bhbrown@kirkland.com
6                                                  KIRKLAND & ELLIS LLP
                                                   555 California Street
7                                                  San Francisco, CA 94104
                                                   Telephone: (415) 439-1400
8                                                  Facsimile: (415) 439-1500

9                                                  Russell E. Levine, P.C. (pro hac vice to be
                                                   filed)
10                                                 russell.levine@kirkland.com
                                                   Kourtney Baltzer (pro hac vice to be filed)
11                                                 kourtney.baltzer@kirkland.com
                                                   KIRKLAND & ELLIS LLP
12                                                 300 North LaSalle
                                                   Chicago, IL 60654
13                                                 Telephone: (312) 862-2000
                                                   Facsimile: (312) 862-2200
14
                                                   Steven Dirks (pro hac vice to be filed)
15                                                 steven.dirks@kirkland.com
                                                   KIRKLAND & ELLIS LLP
16                                                 1301 Pennsylvania Avenue, N.W.
                                                   Washington, D.C. 20004
17                                                 Telephone: (202) 879-5000
                                                   Facsimile: (202) 879-5200
18
                                                   Julie Metkus (pro hac vice to be filed)
19                                                 julie.metkus@kirkland.com
                                                   KIRKLAND & ELLIS LLP
20                                                 401 Congress Avenue, 26th Floor
                                                   Austin, TX 78701
21                                                 Telephone: (512) 678-9100
                                                   Facsimile: (512) 678-9101
22
                                                   Attorneys for Plaintiff Valeo Schalter und
23                                                 Sensoren GmbH

24

25

26

27

28